*844 OPINION OF THE COURT
Lucindo Suarez, J.
The issue in this motion for summary judgment is whether a concessionaire which has a license agreement with the City of New York to maintain and operate a golf course may be liable for injuries sustained by a customer who has paid the required fee to the concessionaire. This court holds that once the customer paid his fee, he ceased to be a member of the general public, and therefore, a duty may be imposed upon the concessionaire arising from its possession and control of the golf course. Consequently, motion for summary judgment by American Golf Corporation (American Golf) is denied as there exists a question of fact whether American Golf breached a duty to plaintiff to maintain the premises in a safe condition.
Plaintiff commenced this action to recover damages for personal injuries allegedly sustained on September 11, 1994 when he tripped and fell in a hole two feet deep by two feet long by two feet wide located near the eighth hole of the Split Rock Golf Course in Bronx County. The Split Rock Golf Course is a public park owned by the City of New York, Department of Parks and Recreation. By contract dated August 12, 1983, the City entered into a license agreement with American Golf wherein it agreed to operate the Pelham Bay, Split Rock, Dycker Beach, Clearview, LaTourette and South Shore Golf Courses located in the Boroughs of Bronx, Brooklyn, Queens, and Staten Island. American Golf contends that it acts as a licensee on a public park, and therefore, it owed no duty to plaintiff arising out of the ownership, possession or control of the premises since it is a mere licensee. American Golf claims that the only duty it owes is that relating to the license agreement with the City of New York, that plaintiff is not in privity of contract with American Golf, and therefore, as a member of the general public, may not commence an action against it.
In article IV of the license agreement, entitled Operation of Facilities, it states that "[t]he Company agrees and represents that it will operate, manage and maintain the golf courses and provide services offered in a good and professional manner during the entire term of this permit.” In section 9.1, it clearly states that "during the term of this Agreement the City shall not be obligated to make repairs, replacements, or additions of any kind whatsoever to the courses, the buildings, equipment, facilities or fixtures therein contained, all of which shall be kept, repaired, maintained, replaced or added to at all times by the Company in good order and repair and in sanitary and safe *845 condition at its sole cost and expense.” In addition, in article XVII of the license agreement, entitled Indemnification, the parties agreed that it was the specific intent of the parties for American Golf to assume full control and responsibility for the operations and maintenance of the golf courses and "for the company to assume all risks attendant to the operation of the premises” (at 38). Moreover, paragraph 17.1 states: "It is, therefore, specifically understood that the Company shall indemnify and hold harmless individually and jointly the City, the Commissioner, their agents, employees, and servants, against any or all claims, actions in law or equity, liabilities, penalties or expenses which may be instituted and/or incurred in connection with the Company’s operations of the premises generally, or the negligence or carelessness of the company, its agents, employees or servants.” See also section 9.0, wherein the company accepts possession of the golf courses in their present condition, as is, and section 10.1, wherein the company has the right to occupy the premises concessioned to it, to operate all facilities hereby concessioned to it, and to continue in possession thereof as long as the agreement is substantially complied with. Based upon the foregoing provisions of the license agreement, movant’s argument that the agreement did not grant it any possessory rights is inaccurate. Moreover, movant’s further argument that no duty attaches to it because it is a licensee without ownership, possession or control of the premises is also inaccurate in view of the license agreement wherein American Golf assumed all risks attendant to the operation of the premises. Consequently, Yachthaven Rest. (103 Bankr 68 [ED NY 1989]), relied upon by American Golf, does not offer guidance because Yachthaven involves a bankruptcy proceeding and does not address the liability of a licensee in a personal injury case, as is the issue here.
In support of its position, American Golf cites a recent Appellate Division case from the Second Department which affirmed an order granting summary judgment dismissing the complaint against American Golf: Daddio v American Golf Corp. (238 AD2d 301 [2d Dept 1997]). The case states (at 301): "The plaintiff brought the instant personal injury action to recover for damages allegedly suffered when she tripped and fell due to a defect in the public sidewalk outside Dyker Heights Golf Course, which is owned by the City of New York and operated and maintained by the defendant American Golf Corporation (hereinafter AGC). The court properly awarded AGC summary judgment, as AGC owed a contractual duty to the City, *846 not to the plaintiff, a member of the public, to maintain the golf course and its surrounding areas (see, Pizarro v City of New York, 188 AD2d 591, 593-594; Francois v New York City, 161 AD2d 319).”
This court finds that Daddio (supra) is distinguishable from the instant action in that plaintiff’s injuries were sustained inside the perimeters of the Split Rock Golf Course, specifically at the vicinity of the eighth hole during the course of a game, whereas in Daddio plaintiff fell in the public sidewalk outside the Dyker Heights Golf Course.
In addition, the cases cited by the Appellate Division in support of its decision are also distinguishable. Pizarro v City of New York (188 AD2d 591 [2d Dept 1992], supra) involved a one-car accident where plaintiff, a passenger who sustained injuries, sued, inter alia, the operator of the vehicle, the vehicle’s owner, the City of New York and Mansfield Contracting Company (Mansfield), the contractor responsible for the maintenance and repair of the street lighting at the accident site. The City of New York and Mansfield moved for summary judgment on the ground that the testimony of the vehicle’s operator failed to establish that any negligence on their part was a proximate cause of the accident. The Court affirmed the granting of summary judgment in favor of both defendants. In finding that Mansfield was entitled to judgment as matter of law, the Court stated (at 593-594) that "[e]ven assuming, arguendo, that Mansfield breached a contractual duty to the City by failing to discover and repair deficiencies in the lighting at the scene of the accident, Mansfield did not owe any duty to plaintiff, a member of the public [citations omitted]. In any event, we note that in view of [the vehicle operator’s] admissions, and the absence of any evidence indicating that defective street lights were a proximate cause of the accident, Mansfield was entitled to judgment as a matter of law [citation omitted].” Similarly, the relevant analogy in Francois v New York City (161 AD2d 319 [1st Dept 1990], supra) concerns a defendant which had a contract with the City to maintain its traffic lights. Plaintiff was injured in a car accident when he eased his vehicle into an intersection where the traffic signal was not functioning properly; the light was stuck on red. Plaintiff sued, inter alia, the City, who interpleaded the contractor. The contractor, Acolyte, moved for summary judgment on the ground that the sole proximate cause of the accident was plaintiff’s negligence in driving past the red light into the intersection. The Supreme Court granted summary *847 judgment on the ground that there was no contractual privity between Acolyte and defendants (sic). In affirming the granting of summary judgment in favor of Acolyte, the First Department held (at 320): "This case is governed by our recent decision in Thompson v City of New York (157 AD2d 634). In Thompson, the plaintiff, a pedestrian, was hit by an automobile in an area ordinarily illuminated by a streetlight, which was unlit at the time of the accident. We affirmed an order granting summary judgment to Acolyte, applying the principle that, in this State, ' "a duty directly assumed to benefit one person does not extend to third parties who are not intended beneficiaries of the undertaking to perform, even if it is foreseeable that someone else might be damaged by the nonfeasance” ’ [citation omitted] Oathout v Johnson, 88 AD2d 1010). In the instant case, although a negligent signal light repair is alleged to have occurred on December 31, 1983, there is no evidence of any negligence despite the completion of discovery. In any event, '[e]ven when the negligence consists of malfeasance in the promised performance, rather than nonfeasance, there is no liability for injuries thereby sustained by members of the general public, at large or of an indeterminate class’ (Oathout v Johnson, supra, at 1010). Accordingly, summary judgment was properly granted.” It appears to this court that the contractual relationship with the City and the contractor responsible for street lighting in Pizarro, Francois and Thompson, and the relationship between the City and American Golf in this instance is quite different. The illumination of streets is a governmental function (Thompson v City of New York, 164 AD2d 773 [1st Dept 1990]), whereas the license agreement herein is between the City and a private commercial company for the promotion of a recreational function. It must also be noted that the contract in Thomspon between Acolyte and the City explicitly stated that the contract "was intended to benefit the city, and not the general public.” (Thompson v City of New York, 157 AD2d, at 635.) In addition, users of the golf course pay a fee to American Golf, unlike members of the general public who benefit from the provision of street lighting without payment of a fee. A further distinction between the lighting contractors in Pizarro, Francois and Thompson and the instant action is that movant herein is a concessionaire obligated to pay the City ongoing annual license fees as a percentage of the gross revenue, and submit quarterly statements to the City. (Art VI.)
Moreover, the other case cited in the discussion of Thompson, Oathout v Johnson (supra), which was also relied upon by *848 American Golf similarly fails to offer guidance as that case involved a plaintiff’s claim for recoupment of an insurance payment.
Finally, this court fails to concur with movant’s interpretation of the license agreement that members of the general public "cannot be deemed to be intended beneficiaries of that portion of the contract relating to operation, repair or maintenance,” because American Golf has no possessory interest, but that members of the general public can sue if excessive fees are charged because it is clear that members of the general public were intended to be specific beneficiaries of the contract concerning fees. (See, mem of law.) If the rationale is that plaintiff cannot commence an action against American Golf for failure to maintain the premises in a safe condition because it is not in privity of contract, then it follows that plaintiff cannot commence an action against American Golf for a refund, but must seek the refund from the City instead. In this regard, American Golfs reliance on Kornblut v Chevron Oil Co. (62 AD2d 831 [2d Dept 1978]) as supporting American Golf’s rationale is misplaced. In Kornblut (at 834): "[t]he plaintiff chose to seek recovery on the theory that the decedent was a third-party beneficiary of the contract between Chevron and the Thruway Authority, and in making that choice risked the consequences which follow the theory of contractual obligation [citation omitted]. We must treat the Thruway Authority as a creation of the State, carrying out a governmental function (Public Authorities Law, § 353) including, among other things, the construction of 'suitable facilities for gas stations’, which 'shall be publicly offered for leasing for operation * * * under rules and regulations to be established by the authority’ (Public Authorities Law, § 354, subd 10), and the operation and maintenance of the Thruway, either by its own equipment or by agreement with independent contractors, or both (Public Authorities Law, § 360). Hence, the contract between Chevron and the Thruway Authority and the contract between [defendants] must be considered in the light of the law controlling the relationship between the government and its contractor and a third party claiming injury arising out of a breach of the contract.” In contrast, plaintiff herein is not suing on a contractual theory; plaintiff claims that defendants were negligent in the maintenance of the facilities.
Finally, the City’s cross motion for dismissal of the complaint pursuant to CPLR 3211 (a) (7) and/or 3212 is also denied, as the City retained supervisory rights of the operation of the *849 golf course, rights to enter the premises to ascertain compliance with rules and codes, and the right to terminate the license agreement at any time except for capricious or arbitrary reasons. (See, license agreement art X.)