(237 P.3d 1258)
No. 101,382

JIM BYERS and SUE BYERS, *Appellants/Cross-appellees*, v. DENNIS C. SNYDER and SNYDER'S MARINA CORPORATION, *Appellees/Cross-appellants*, and STATE OF KANSAS, DEPARTMENT OF WILDLIFE AND PARKS, *Defendant*.

Opinion filed August 20, 2010.

*Ryan M. Peck* and *Joshua J. Hofer*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellants/cross-appellees.

*Randall J. Price*, of Wichita, for appellees/cross-appellants.

BEFORE STANDRIDGE, P.J., GREEN and HILL, JJ.

GREEN, J.: Jim and Sue Byers appeal from a summary judgment granted in favor of Dennis Snyder and Snyders' Marina Corpora-

tion (Snyder) in their breach of contract claim. On appeal, the Byers contend that they are entitled to a boat slip for their houseboat under Snyder's concessionaire's agreement with the Kansas Department of Wildlife and Parks (Department). The concessionaire's agreement vested Snyder with the obligation to furnish boat slips to park patrons of the Cheney State Park Marina and Concession. On the Byers' contract law claim, the threshold question is whether the Byers have standing to enforce the contract that was entered into by Snyder and the Department. The Byers, not being a party to the contract, contend that they have standing as third-party beneficiaries.

We determine that because the Byers have previously paid mooring fees for the right to moor their houseboat at the marina, they ceased to be a member of the general public. Moreover, the Concession Agreement imposed an obligation on Snyder, arising from his possession, control, and ownership of the boat slips, to furnish sufficient boat slips to satisfy the demands of park patrons. We determine that the Concession Agreement conferred a benefit on park patrons who intended to moor their boats at the marina. As a result, the Byers can be classified as third-party beneficiaries of the Concession Agreement between Snyder and the Department. We further determine that the Byers have standing on their contract claim. Accordingly, we reverse and remand for trial.

Next, the Byers contend that the trial court wrongly concluded that it lacked authority to order reinstatement of the boat slip agreement between the Byers and Snyder. We agree. Accordingly, we reverse and remand for trial.

Turning next to Snyder's cross-appeal, we note that Snyder appeals from a summary judgment granted in favor of the Byers in Snyder's counterclaims for tortious interference with existing contractual relations and intentional private nuisance. Finding no error, we affirm. In addition, Snyder contends that the trial court erred in dismissing his counterclaim for invasion of privacy. We disagree. Accordingly, we affirm. Finally, Snyder asserts that the trial court erred in dismissing his counterclaim for defamation. We agree. Accordingly, we reverse and remand for trial.

On January 25, 1991, the Department entered into a Concession Agreement with Wynn Robert Bailey. Under the terms of the Concession Agreement, Bailey was to furnish concession services and facilities on Cheney Reservoir "to the general public" and "park patrons," beginning March 15, 1991, and ending on October 1, 2015. As concessionaire, Bailey was to provide, at a minimum, a floating dock and 141 boat slips with 68 of them covered. In exchange, Bailey was granted the exclusive right to provide concession services on the premises. He was also required to pay the Department an annual rental fee of $1,000 and 2% of all gross receipts.

On July 19, 1999, Bailey assigned the Concession Agreement to Damien Bailey and Dennis C. Snyder. Later, on August 19, 2005, the Concession Agreement was assigned completely to Snyder. Snyder operated the marina in the name of his company, Snyder Marina Corporation.

On August 24, 2007, the Byers sued Snyder for breach of contract and Snyder and the Department for promissory estoppel and declaratory judgment. They asked for a judgment requiring the defendants to allow the Byers to use their houseboat at the Cheney Reservoir Marina and to rent them a boat slip at the marina under the customary terms offered to other park patrons. Snyder answered and asserted several counterclaims, alleging defamation, invasion of privacy, tortious interference with existing contractual relations, and intentional private nuisance.

The Department moved to dismiss the Byers' claims against it for lack of jurisdiction and judgment on the pleadings. The trial court denied the Department's motion and gave the Byers leave to amend their petition to comply with the Kansas Act for Judicial Review and Enforcement of Agency Actions. See K.S.A. 77-601 *et seq.* After the Byers filed their first amended petition, the Department moved to transfer venue and bifurcate and stay proceedings, which the trial court granted. The court transferred all claims against the Department to Shawnee County District Court.

The Byers moved for partial summary judgment on their claims for a declaratory judgment and for an order requiring Snyder to allow the Byers to moor their houseboat at the Cheney Reservoir

Marina. Moreover, the Byers moved for summary judgment on all of Snyder's counterclaims. Snyder also moved for summary judgment on the Byers' claim that Snyder breached his Concession Agreement with the Department.

The trial court granted the Byers' motion for summary judgment as to Snyder's counterclaims for tortious interference with contractual relations and nuisance. The trial court found no facts showing a breach of contract by the Department. Moreover, the court found no facts indicating that the Byers intended to create a nuisance or to harm Snyder. The trial court denied the Byers' motion for summary judgment as to Snyder's counterclaims for defamation and false light invasion of privacy, finding genuine issues of material fact precluded summary judgment.

As to the Byers' claim for declaratory judgment, the trial court determined that it lacked standing to enforce the Concession Agreement between Snyder and the Department as third-party beneficiaries because the Concession Agreement was intended to benefit the general public. Consequently, the trial court granted Snyder's motion for summary judgment on the Byers' breach of contract claim.

In addition, the trial court ruled, *sua sponte*, that as a matter of law it had no authority to require Snyder to furnish the Byers a mooring slip for their houseboat. It also ruled, *sua sponte*, that Snyder's claims for defamation and false light invasion of privacy failed as a matter of law. The trial court stated that the Byers' words were not highly offensive to an ordinary person going about his or her business at the marina as a matter of law. Therefore, the only remaining issues were whether the Byers were entitled to recover damages based on a theory of promissory estoppel and, if so, the extent of the damages for relocating their houseboat. Later, the Byers dismissed without prejudice their remaining claim for damages associated with the cost to relocate their houseboat.

*Standard of Review for All Issues*

When the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a

matter of law, summary judgment is appropriate. The trial court must resolve all facts and inferences reasonably drawn from the evidence in favor of the adverse party opposing summary judgment. The adverse party must present evidence to establish a disputed material fact. To preclude summary judgment, the disputed fact must be material to the case's conclusive issues. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009). Where there is no factual dispute, appellate review of a summary judgment order is de novo. *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 240, 201 P.3d 680 (2009).

*Did the District Court Err in Granting Snyder's Motion for Summary Judgment on the Breach of Contract Claim Based on the Byers' Lack of Standing?*

The Byers argue that the trial court erred in granting Snyder's motion for summary judgment on their breach of contract claim because they are intended third-party beneficiaries of the Concession Agreement under the identifiable class called park patrons. Snyder responds that the Byers are merely incidental third-party beneficiaries as members of the general public and that they do not enjoy the necessary privity of contract.

In the present case, the trial court granted Snyder's motion for summary judgment because it ruled the Byers did not have standing to sue. Standing implicates the court's jurisdiction to hear a case, so the existence of standing is a question of law over which an appellate court's scope of review is unlimited. *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 751, 189 P.3d 494 (2008). Furthermore, this lack of standing was based on the Concession Agreement, and interpretation and legal effect of written instruments are matters of law over which appellate courts exercise unlimited review. *Miller*, 288 Kan. at 32. Regardless of the trial court's construction of a written contract, an appellate court may construe it and determine its legal effect. *City of Arkansas City v. Bruton*, 284 Kan. 815, 829, 166 P.3d 992 (2007).

In the present case, the standing issue turns on whether Snyder and the Department intended to create an identifiable class of third-party beneficiaries, called park patrons, whom Snyder and the Department intended to benefit by the Concession Agreement and to which the Byers belong.

In determining whether a particular person is an intended beneficiary of a contract, the court applies the general rules for construction of contracts. *Gray v. Manhattan Med. Center, Inc.*, 28 Kan. App. 2d 572, 580-81, 18 P.3d 291 (2001) (finding that uniformity among leases did not necessarily imply tenants were third-party beneficiaries of each other's leases). When interpreting written contracts, the primary rule is to ascertain the parties' intent. If the contract terms are clear, the parties' intent is determined from the contract language without applying rules of construction. *Anderson v. Dillard's Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007). Contracts should not be interpreted by isolating one particular sentence or provision, but by construing and considering the entire instrument. *Bruton*, 284 Kan. at 832-33. Reasonable interpretations are favored, and results vitiating the purpose of the terms of the agreement to an absurdity should be avoided. *Wichita Clinic v. Louis*, 39 Kan. App. 2d 848, 853, 185 P.3d 946, *rev. denied* 287 Kan. 769 (2008).

Whether a written instrument is ambiguous is a question of law subject to de novo review. *Bruton*, 284 Kan. at 829. A written instrument is ambiguous when the application of rules of interpretation to the whole fails to ascertain which one of two or more meanings is conveyed by the parties' words. *Central Natural Resources*, 288 Kan. at 245. Where ambiguity or uncertainty is involved, the parties' intentions are ascertained by considering the language employed, the circumstances existing when the agreement was made, the object sought, and other circumstances tending to clarify the parties' real intentions. *Amoco Production Co. v. Wilson, Inc.*, 266 Kan. 1084, 1088, 976 P.2d 941 (1999).

Third-party beneficiaries of a contract are divided into intended beneficiaries and incidental beneficiaries, and only intended beneficiaries have standing to sue for damages resulting from the breach of a contract. See *State ex rel. Stovall v. Reliance Ins. Co.*,

278 Kan. 777, 795-96, 107 P.3d 1219 (2005) (finding the State was not an intended third-party beneficiary of a subcontract); *Gray*, 28 Kan. App. 2d at 580-81. The burden of establishing standing to bring suit as a third-party beneficiary rests with the party asserting it; see *Stovall*, 278 Kan. at 793.

Intended beneficiaries of contracts may maintain an action to enforce a contract even if they had no knowledge of the contract when it was made and paid no part of the consideration. *Fasse v. Lower Heating & Air Conditioning, Inc.*, 241 Kan. 387, 388-89, 393, 736 P.2d 930 (1987) (finding employees had standing to sue a contractor as third-party beneficiaries of a contract between the contractor and owner when the contract incorporated wage rates for the employees). Nevertheless, parties are presumed to contract for themselves, and their intent that a third person receive a direct benefit must be clearly expressed in the contract. See *Stovall*, 278 Kan. at 794-95; *Gray*, 28 Kan. App. 2d at 580. But *cf. Hawkinson v. Bennett*, 265 Kan. 564, 594, 962 P.2d 445 (1998) (stating the intent to benefit a nonparty need not be expressly recited in the contract but must be apparent from the terms of the agreement, the surrounding circumstances, or both). Furthermore, knowledge by the contracting parties that a contract will benefit a third party does not necessitate the contracting parties' intent to benefit the third party; see *Stovall*, 278 Kan. at 795; *Gray*, 28 Kan. App. 2d at 580.

A third-party beneficiary does not need to be personally named in the contract to have standing, as long as he or she is a member of a designated class or identifiable as a benefitted person. *Hartford Fire Ins. Co. v. Western Fire Ins. Co.*, 226 Kan. 197, 210, 597 P.2d 622 (1979). Nevertheless, when one of the contracting parties is a government entity and the contract is made for the general public benefit, members of the public are generally not considered third-party beneficiaries with standing to sue. See *Roher Transfer & Storage Co. v. Hutchinson Water Co.*, 182 Kan. 546, 549-50, 322 P.2d 810 (1958); but see *Anderson v. Rexroad*, 175 Kan. 676, 266 P.2d 320 (1954) (Where a city makes a contract with defendant contractor for the express benefit of its citizens and inhabitants,

the latter are third-party beneficiaries and can sue the building contractor directly.).

In the present case, the trial court cited *Roher* in finding that the Concession Agreement only benefitted the general public and not an identifiable subgroup or designated class. In *Roher*, 182 Kan. at 548-50, our Supreme Court held that a contract between a water company and the city, in which the water company agreed to furnish water to the city for extinguishing fires, was not enforceable by city residents as third-party beneficiaries. Therefore, the residents did not have standing to sue for fire losses sustained in part because of the water company's failure to furnish the water pressure required by the contract. See 182 Kan. at 547-50. Snyder supports this interpretation, arguing that the Byers are merely incidental beneficiaries as members of the general public.

The Byers, however, argue that the trial court erred by relying on *Roher* because the only provision in the *Roher* contract that could be construed as supporting the existence of an intentional third-party beneficiary was one that stated the water company would hold the city harmless for any liability it incurred as a result of the water company's mistakes. See 182 Kan. at 548-49. A further distinction between the facts in *Roher* and this case is that the contract in *Roher* did not identify third parties by name. On the other hand, the Byers point out that the Concession Agreement in the present case specifically designates a class of person called park patrons in Section 1.I and requires that the services and facilities listed in Section 1.A, including moorage, be provided in sufficient quantity to satisfy the park patrons' demand at all times.

Nevertheless, the trial court reasoned that the Concession Agreement could not have created a designated class of third-party beneficiaries with standing to sue because it would create an onerous burden on Snyder if the number of park patrons dramatically skyrocketed and increased demand or if Snyder failed to adequately stock sufficient gasoline or bait. The Byers argue, however, that the trial court should not have ignored the plain language of the Concession Agreement because some hypothetical scenarios might be burdensome to Snyder.

In section 1.D of the Concession Agreement, entitled "Services," it states that "[c]oncessionaire shall provide, at a minimum, the following marina facilities on the premises: floating dock to include fuel sale capabilities as well as 141 boat slips with 68 of these covered." In section 1.I, it clearly states that the concessionaire will "supply and have ready for sale each and every vendible article specified in Section 1.A," which includes "moorage," "in sufficient quantity to satisfy demands of park patrons at all times that the concession is operated under the terms of this agreement." Further, section 4.A of the Concession Agreement, entitled "Breach," makes the failure to satisfy a demand a material breach of the contract: "Each term of this agreement is material and Concessionaire's failure to remedy a breach of this agreement within (30) days of receiving written notice of the breach shall be grounds for termination of the entire agreement by the Department."

In addition, under section 19 of the Concession Agreement, entitled "Hold Harmless," the parties agreed that it was the specific intent of the parties for the concessionaire to assume full control and responsibility for the operation and maintenance of the marina and concession and for the concessionaire to assume all risks attendant to the "operation of the premises." For example, paragraph 19 states:

"Concessionaire shall hold the Department, its officers, agents, and employees harmless from and shall defend and indemnify the Department from and against all liability for injuries to or death of persons or damage to property or damages arising from liens or claims of any nature resulting from the use and operation of the premises, or the construction, modification, alteration, or repair of any improvements by Concessionaire upon the premises."

See also section 8.A. of the Concession Agreement, entitled "Ownership of Property," wherein the concessionaire is given the ownership of "the 141 boat slips and floating dock."

Here, the Concession Agreement contains provisions dealing with liability for damages emanating from "claims of any nature resulting from the use and operation of the premises." Moreover, the Concession Agreement makes the concessionaire liable for any claims resulting from the use and operation of the premises. In addition, the Concession Agreement calls for the concessionaire to

rent boat slips, which the concessionaire owns, to park patrons. The park patrons who lease a boat slip must pay a rental fee approved by the Department. See section 1.G ("Prices charged by Concessionaire for supplies, services and facilities shall be subject to prior written approval of the Department."). Further, the Concession Agreement requires the concessionaire to "keep a schedule of such prices posted at all times in a conspicuous place on the premises." Thus, an argument can be made that the Department is contracting for the express benefit of its park patrons by contract provisions intended to be enforced by park patrons as occasion should arise.

In addition, because renters of the boat slips pay a rental fee to the concessionaire, they are unlike members of the general public who benefit from other provisions of the Concession Agreement without payment of a fee for a boat slip. Moreover, some of the park patrons who are renting boat slips at the marina will have their boats moored at the marina during the boating season—from March 15 to October 15. See Section 1.F. As a result, park patrons will spend overnights and weekends on their boats. These are further distinctions from members of the general public.

As a result, we determine that once a park patron pays a fee for a rental boat slip, the park patron ceases to be a member of the general public; see *Mangieri v. City of New York*, 174 Misc. 2d 843, 847, 667 N.Y.S.2d 201 (1997) (Unlike members of the general public, users of the golf course pay a fee to the concessionaire. As a result, the court held that once golf customers paid their fee to use the golf course, they ceased to be a member of the general public.); *Bush v. Upper Valley Telecable Co.*, 96 Idaho 83, 85, 524 P.2d 1055 (1974) (Television cable service subscriber was a third-party beneficiary of a franchise contract between the city and the cable service and was entitled to enforce the contract as a member of a limited class for whose benefit the contract was made and was entitled to recover damages for violation of the rate schedule contained in the franchise contract with the city.). Thus, in this case, an obligation was imposed upon Snyder, arising from the possession, control, and ownership of the boat slips, to furnish sufficient boat slips to satisfy the demands of park patrons at the marina. The

benefit conferred on the Byers by the Concession Agreement was "primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly [to the Byers] if the benefit is lost." See *Moch Co. v. Rennselaer Water Co.*, 247 N.Y. 160, 164, 159 N.E. 896 (1928). Consequently, the trial court erred when it determined that the Byers lacked standing on their contract claim.

*Did the Trial Court Err When It Concluded It Lacked Authority to Order Reinstatement of a Boat Slip Agreement Between the Byers and Snyder?*

The Byers argue that the trial court erred in finding, *sua sponte*, during a hearing on motions in limine, that it lacked the authority to order reinstatement of the boat slip agreement between the Byers and Snyder. Snyder, however, argues that the trial court did not err because promissory estoppel is inapplicable to the present case.

In the present case, the trial court did not address whether the Byers could succeed on a claim of promissory estoppel. It merely opined that even if the Byers were able to prove the elements of promissory estoppel, the court would not have the authority to order reinstatement of the boat slip agreement between the Byers and Snyder. Later, the Byers voluntarily dismissed their request for damages associated with their claim of promissory estoppel.

Under a theory of promissory estoppel, a promise which the promisor should reasonably expect to induce action on the part of the promisee and which does induce such action is binding if injustice can be avoided only by enforcement of the promise; see *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1010, 974 P.2d 569 (1999). Generally, the remedy in a promissory estoppel action can be modified as justice demands and may include specific performance of a contract. See, *e.g.*, 266 Kan. at 1011 (discussing execution of a deed); *Texas Co. v. Sloan*, 171 Kan. 182, 182-85, 231 P.2d 255 (1951) (discussing the signing of a lease); *Owasso Dev. Co. v. Associated Wholesale Grocers, Inc.*, 19 Kan. App. 2d 549, 551, 873 P.2d 212, *rev. denied* 255 Kan. 1003 (1994) (discussing specific performance of a lease).

In the present case, the Byers sought specific performance of a boat slip agreement based on a theory of promissory estoppel. There were genuine issues of material fact surrounding this theory, including why the original boat slip agreement was terminated, the extent to which the Byers relied on any assurances made by Snyder, and whether there was an agreement supported by consideration on either side under which both parties adequately performed. See *Miller*, 288 Kan. at 32; *Decatur County Feed Yard, Inc.*, 266 Kan. at 1011. Therefore, the trial court erred when it determined that it did not have the authority to order specific performance of a boat slip agreement under a theory of promissory estoppel.

*Did the Trial Court Err in Granting the Byers' Motion for Summary Judgment on Snyder's Counterclaims for Tortious Interference with Existing Contractual Relations and Intentional Private Nuisance?*

Summary judgment should be granted with caution in negligence actions, but it is proper if the adverse party shows there is no evidence indicating negligence or if the only questions presented are questions of law. *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008); *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 39, 169 P.3d 1052 (2007); *Edwards v. Anderson Engineering, Inc.*, 284 Kan. 892, 904, 166 P.3d 1047 (2007).

Snyder argues that the trial court erred in granting the Byers' motion for summary judgment on his claims for tortious interference with existing contractual relations and intentional private nuisance, but does not explain why. The Byers counter that Snyder attempts to recharacterize the claim of tortious interference with existing contractual relations into a claim for tortious interference with existing contractual relations or tortious interference with prospective business advantage or relationship. Moreover, the Byers contend that Snyder's claim for intentional private nuisance lacks support.

Intentional private nuisance is a tort relating to the intentional and unlawful interference with a person's use or enjoyment of his or her land. *Smith*, 285 Kan. at 47. It requires that the actor act with the purpose or intent of causing a nuisance or to know it is

substantially certain to result from his or her conduct; it is not sufficient to make invasion intentional if the actor merely realizes or should realize that his or her conduct involves a serious risk or likelihood of causing an invasion. *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 732-33, 915 P.2d 80 (1996).

The Byers point out that in his trial court response to the Byers' motion for partial summary judgment, Snyder claimed that the Byers' failure to immediately remove their houseboat from the marina parking lot amounted to a private nuisance. Nevertheless, Snyder did not offer any evidence that the Byers' alleged failure to immediately remove their houseboat from the marina parking lot interfered with the use or enjoyment of the land, or caused damages of any kind. Claims for damages that are conjectural and speculative cannot form a sound basis for an award. *McKissick v. Frye*, 255 Kan. 566, 591, 876 P.2d 1371 (1994); see *Kendrick v. Manda*, 38 Kan. App. 2d 864, 871, 174 P.3d 432 (2008).

Moreover, Snyder does not offer any factual support, legal support, or substantial argument for his contention that the trial court erred in granting the Byers' motion for summary judgment on his claim for intentional private nuisance. An issue not briefed by an appellant is deemed waived or abandoned. *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009). A point raised incidentally in a brief and not argued there is also deemed abandoned. *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008). Similarly, failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief the issue. *State v. Conley*, 287 Kan. 696, 703, 197 P.3d 837 (2008). In his brief, Snyder does no more than mention intentional private nuisance in passing, which amounts to waiver of his claim.

Next, as the Byers pointed out in their brief, Snyder has recharacterized the claim for tortious interference with existing contractual relations as one for tortious interference with prospective business advantage or relationship. "Tortious interference with a contract seeks to preserve existing contracts, while tortious interference with a prospective business advantage or relationship seeks to protect future or potential contractual relations." *Cohen v. Bat-*

*taglia,* 41 Kan. App. 2d 386, 396, 202 P.3d 87 (2009), *rev'd on other grounds* 296 Kan. 542, 293 P.3d 752 (2013). Despite these differences, the torts are similar in that they are predicated on malicious conduct by a defendant. 41 Kan. App. 2d at 396 (citing *Burcham v. Unison Bancorp., Inc.*, 276 Kan. 393, 423-25, 77 P.3d 130 [2003]).

Tortious interference with an existing contract requires: (1) a contract; (2) knowledge of the contract by the wrongdoer; (3) intentional procurement of a breach of contract; (4) absence of justification; and (5) damages resulting from the wrongful interference. See *Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 168-69, 872 P.2d 252 (1994).

Alternatively, tortious interference with a prospective business advantage or relationship requires: "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of the defendant's misconduct." *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986).

Snyder first mentions the new claim for tortious interference with prospective business advantage or relationship in the brief on appeal, although the trial court's agreed pretrial conference order clearly outlines Snyder's claim as one of tortious interference with the existing Concession Agreement between Snyder and the Department. Issues not raised before the trial court cannot be raised on appeal. *Miller v. Bartle*, 283 Kan. 108, 119, 150 P.3d 1282 (2007).

Moreover, in Snyder's failed attempt to recharacterize its claim of tortious interference with existing contractual relations, Snyder essentially fails to brief it and does not offer any factual or legal support for the contention that the trial court erred in dismissing it. An issue not briefed by the appellant is deemed waived or abandoned. See *Kingsley*, 288 Kan. at 395; *Conley*, 287 Kan. at 703; *Cooke*, 285 Kan. at 758.

Furthermore, even assuming arguendo that Snyder did not waive the issue, Snyder does not offer any genuine issues of material fact concerning the third and fifth elements of a claim for tortious interference with existing contractual relations. More specifically, Snyder does not offer any evidence that the Byers intentionally procured a breach of the Concession Agreement and does not offer any evidence of damages resulting from such an alleged wrongful interference. In fact, Snyder does not offer any evidence of a breach of the Concession Agreement at all, which is fatal to the claim.

Alternatively, assuming arguendo that Snyder may be allowed to recharacterize the claim as one for tortious interference with a prospective business advantage or relationship, Snyder still fails to set forth any genuine issues of material fact that would preclude summary judgment. Snyder fails to offer any evidence concerning the third or fifth elements of a claim for tortious interference with a prospective business advantage or relationship. More specifically, Snyder does not offer any evidence beyond speculation or conjecture that, except for the Byers' conduct, Snyder was reasonably certain to have a continued relationship or realized expectancy, nor does Snyder offer any evidence of damages suffered as a direct or proximate cause of the Byers' alleged misconduct. As stated earlier, claims for damages that are conjectural and speculative cannot form a sound basis for an award. *McKissick*, 255 Kan. at 591; *Kendrick*, 38 Kan. App. 2d at 871.

Therefore, the trial court properly granted the Byers' motion for partial summary judgment as to Snyder's claims for tortious interference with existing contractual relations and intentional private nuisance.

### Did the Trial Court Err in Dismissing Snyder's Counterclaims for Defamation and Invasion of Privacy?

Snyder argues that the trial court erred in dismissing the counterclaims for defamation and invasion of privacy because genuine issues of material fact precluded summary judgment. On the other hand, the Byers contend that the statements forming the basis for Snyder's counterclaims were not defamatory, as a matter of law,

and that Snyder has not provided any evidence of damage to Snyder's reputation.

Although defamation and false light invasion of privacy are often treated the same in Kansas, Snyder lists them as separate causes of action. See *Dominguez v. Davidson*, 266 Kan. 926, 938, 974 P.3d 112 (1999). The elements of a claim for false light invasion of privacy are as follows: (1) that publication of some kind must be made to a third party; (2) that the publication must falsely represent the person; and (3) that representation must be highly offensive to a reasonable person. 266 Kan. at 937.

On appeal, Snyder makes passing mention of the invasion of privacy claim. An issue that is not briefed by an appellant, or that is raised incidentally in a brief and not argued, is deemed waived or abandoned. *Kingsley*, 288 Kan. at 395; *Cooke*, 285 Kan. at 758. Also, failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief the issue. *Conley*, 287 Kan. at 703. Therefore, the trial court properly granted the Byers' motion for summary judgment on Snyder's false light invasion of privacy claim.

In Kansas, the elements of defamation are as follows: (1) false and defamatory words; (2) communication to a third person; and (3) harm to the reputation of the person defamed. *Droge v. Rempel*, 39 Kan. App. 2d 455, 459, 180 P.3d 1094 (2008). On appeal, Snyder states the alleged defamation in the present case occurred when the Byers told the Department employees and other unidentified third parties that Snyder had staggered down the deck at the marina on Memorial Day and that Snyder strongly smelled of alcohol. Snyder originally alleged defamation concerning statements made by the Byers during the trial court proceedings, but the Byers point out that those statements enjoy absolute privilege under *Froelich v. Adair*, 213 Kan. 357, 360, 516 P.2d 993 (1973), and Snyder does not contest this fact on appeal.

Concerning the alleged defamatory statements made outside the context of the judicial proceedings, the Byers argue that Snyder's claim fails because the alleged statements were personal opinion or hyperbole. Moreover, the Byers contend that Snyder's claim fails because Snyder has not presented any evidence of harm to Sny-

der's reputation. First, the Byers argue that when they told the Department employees and other unidentified third parties that Snyder staggered down the deck at the marina on Memorial Day and strongly smelled of alcohol, it was merely a recounting of observations and opinions made by their son, Kevin Fischer. In suggesting these statements were merely opinion or hyperbole, the Byers cite *Gatlin v. Hartley, Nicholson, Hartley & Arnett, P.A.*, 29 Kan. App. 2d 318, 320, 26 P.3d 1284 (2001).

The allegedly defamatory statement in *Gatlin*: " ' "[The husband] isn't . . . totally innocent in all this, there are things about him you don't know," ' " was made to a third party by the wife's divorce attorney. 29 Kan. App. 2d at 320. The *Gatlin* court found this was personal opinion and hyperbole (citing *Liqui-Box Corp. v. Stein*, 98 Ohio App. 3d 481, 484, 648 N.E.2d 904 [1994], finding personal opinion and hyperbole instead of defamation where the defendant described allegations against him as " '[t]he worst that I've seen, short of rape' "). *Gatlin*, 29 Kan. App. 2d at 320. The statements in the present case do not mirror those in *Gatlin* or *Liqui-Box Corp.*, where the defendants were clearly giving a personal opinion reflecting subjectivity. Telling third parties that Snyder staggered down the deck at the marina and strongly smelled of alcohol was a recounting of objective observations, not opinion or hyperbole.

Second, the Byers maintain that Snyder's defamation claim fails because he has not presented any evidence of damages. Nevertheless, Snyder's wife furnished an affidavit stating that Snyder has lost customers at least in part because of the Byers alleged defamatory comments to third parties. In addition, Snyder suggested at the *in limine* conference that there may be testimony from an independent witness concerning his view of Snyder and the marina after hearing the allegedly defamatory comments.

When the evidence is viewed in the light most favorable to Snyder, there are genuine issues of material fact which preclude summary judgment. Namely, questions of fact remain as to whether the Byers' words were false and whether they harmed Snyder's reputation. Therefore, the trial court erred when it granted the

Byers' motion for summary judgment on Snyder's defamation claim.

Affirmed in part, reversed in part, and remanded for further proceedings.